IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ANDREW ALLEN COOK,        :
        :
        Petitioner        :
        :
        vs.        :
        :        CIVIL ACTION NO.: 5:09-CV-25 (CAR)
STEPHEN UPTON, Warden,        :
        :
        Respondent        :
_____:

## ORDER

Andrew Allen Cook (hereinafter "Petitioner" or "Cook"), an inmate on death row at the Georgia Diagnostic and Classification Prison in Jackson, Georgia, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For reasons discussed below, this petition is denied.

## I. BACKGROUND

### A. Facts

The Georgia Supreme Court set forth the historical facts concerning this case:

> [A]t approximately midnight on January 2, 1995, Mercer University students Hendrickson and Cartagena were parked on a small peninsula known as "the Point," which juts into Lake Juliette in Monroe County, north of Macon. Cook drove onto the Point, parked his Honda CRX near Hendrickson's and Cartagena's car, and shot them. Cook fired fourteen times with an AR-15 rifle from a distance of about forty feet and then moved closer and fired five times with a nine millimeter Ruger handgun. Hendrickson and Cartagena were each hit multiple times and killed. Cook then went to the passenger side of the victims' car, removed Cartagena, and dragged her about 40 feet. He partially undressed her, knelt between her legs, and spit on her. Cook then drove away. The murders were completely random: Cook did not know the victims and there was no interaction between Cook and the victims before he killed them.

Several people parking or camping around Lake Juliette heard the shots, and the murders were reported to the police the next morning when some campers found the bodies. A couple parked near the Point when the shots were fired said they saw a 1980s-model Honda CRX parked near the entrance to Lake Juliette. Later, they saw headlights going onto the Point, heard shots, and observed the CRX speeding away from the Point. The police recovered .223 caliber and nine millimeter bullets and shell casings from the crime scene, and the State Crime Lab reported that the weapons used in the murders were probably an AR-15 rifle and a nine millimeter Ruger handgun. There was saliva mixed with tobacco dried on Cartagena's leg, and the Crime Lab extracted DNA from the saliva. The police began looking for suspects who chewed tobacco, matched the DNA taken from the saliva, and owned or had access to a Honda CRX, an AR-15 rifle, and a nine millimeter Ruger pistol.

The investigation lasted almost two years. Many people were interviewed and dozens of suspects were excluded after they submitted blood or saliva samples to the Crime Lab, or allowed their weapons to be examined by a state firearms expert. In the fall of 1996, GBI Agent Randy Upton began tracking the purchasers of AR-15 rifles in the Macon area. He obtained a list of 108 people who bought AR-15 rifles from 1985 to 1995 from one of Macon's most popular gun stores, and he started calling them and asking if they would give saliva samples and allow examinations of their rifles. On November 27, 1996, Agent Upton contacted Cook. Agent Upton told Cook he was conducting an investigation into the Lake Juliette murders and that Cook owned an AR-15 rifle in 1994 and 1995. Cook replied that he had "gotten rid of" his AR-15 in April 1994. Agent Upton stated that that was not possible because the records show that Cook did not buy his AR-15 until August 1994. Cook then became defensive and stated that his father was an FBI agent, and he did not have to cooperate. Agent Upton asked for a saliva sample, and Cook said he needed to talk with his father before giving a saliva sample. The conversation ended.

Agent Upton learned that Cook pawned his AR-15 rifle back to the gun store in May 1995, five months after the murders. The police also discovered that Cook had an acquaintance purchase a nine millimeter Ruger handgun for him in December 1993 at the same gun store, because Cook was too young to buy it himself. Cook sold the Ruger to a friend in July 1995. The police sought to obtain these weapons from their current owners. They also learned that Cook owned a 1987 Honda CRX at the time of the murders.

One of Cook's friends, who worked with Cook at a diaper factory, testified that in late November 1996 he and Cook had a conversation about "the worst thing you ever did." Cook said he had killed someone with an AR-15. The friend did not believe Cook, but asked why he did it. Cook replied that he did it "to see if I could do it and get away with it." Cook refused to provide any more details. The friend testified that the following day at work, Cook received a call on his pager, and left

his work area to return the call. Cook returned 15 minutes later and was "as white as a ghost." Cook said "I got to go," and spit the tobacco he had been chewing into a trash can. Cook said it was the GBI who had called and they wanted to question him about what he and the friend had talked about the day before, and test his saliva. He said, regarding the saliva, "that's a DNA test right there, so they got my ass." Another friend testified that Cook told him in late November 1996 that he needed to leave town because it was "getting hot."

After going to Cook's home and not finding him, Agent Upton called Cook's father, John Cook, on December 4, 1996. John Cook was an FBI agent and had been an FBI agent for 29 years. Agent Upton said he needed to ask Cook a few questions regarding the Lake Juliette murders, and asked John Cook for assistance in locating him. John Cook said he could probably contact his son. John Cook, who knew about the case from the media but had not worked on it, testified that he did not think his son was a suspect.

John Cook paged his son several times and at 11:00 p.m. Cook returned his calls. John Cook told his son the GBI was looking for him concerning the Lake Juliette murders and asked him if he knew anything about them. Cook replied, "Daddy, I can't tell you, you're one of them . . . you're a cop." John Cook said he was his father first and, believing his son may have been a witness, asked Cook if he was there during the shooting. Cook said yes. John Cook asked his son if he saw who shot them, and Cook replied yes. Although he still thought "maybe he was just there and saw who shot them," John Cook asked his son if he shot them. After a pause, Cook said yes. Cook told his father he was fishing at Lake Juliette and had an argument with the male victim. The male victim threatened him with a gun, and Cook shot the victims in self-defense. Cook realized that the male victim had only threatened him with a pellet gun, and he threw the pellet gun into the woods. John Cook urged his son to go to the authorities but Cook said he was going to run and "just disappear." John Cook was worried that his son was going to kill himself.

John Cook was stunned by what his son had told him. After speaking with his wife, he called his friend and FBI supervisor, Tom Benson, who was at a conference in New Orleans. He and Benson decided that Benson would fly back to Georgia the next day and the two men would go to Monroe County Sheriff John Bittick, and John Cook would tell the sheriff what his son had told him. They arrived at the Monroe County sheriff's office at about 4:00 p.m. on December 5, 1996.

At about 11:45 a.m. on December 5, 1996, Cook was arrested by a game warden for shooting deer and turkeys out of season and giving a false name. He was taken to the Jones County sheriff's office. Agent Upton, who did not know about Cook's admission to his father, learned that Cook was being held in Jones County for game violations. He drove to Jones County to question Cook about the

Lake Juliette murders. When Agent Upton introduced himself and asked to speak with him about the murders, Cook blurted, "it's been two years since the murders and you guys don't have anything; I had a CRX; I had an AR-15; I had a Ruger P89; you guys are going to try to frame me." Cook added, "get my father and get me a lawyer and I'll tell you what you want to hear." The interview terminated. Agent Upton subsequently learned from Sheriff Bittick that John Cook was in Monroe County, and that Cook had made an admission to his father the night before. Agent Upton transported Cook to Monroe County.

After Cook arrived at the Monroe County sheriff's office, John Cook asked Sheriff Bittick if he could speak with his son, and the sheriff agreed. Cook and his father had a private meeting. Both men were crying and John Cook hugged his son. John Cook told his son he did not believe that he told the whole truth on the phone. Cook replied that there was no pellet gun, that "I pulled in, the car was already there, and I just stopped and shot them." Cook then dragged the female victim from the car to make it look like an assault or robbery. John Cook testified at trial about his son's admissions.

The police recovered from the current owners the AR-15 rifle and nine millimeter Ruger handgun that Cook owned in January 1995. Ballistics testing revealed that they were the murder weapons. Cook's DNA matched the DNA extracted from the saliva on Cartagena's leg; the state DNA expert testified that only one in twenty thousand Caucasians would exhibit the same DNA profile.

*Cook v. State*, 270 Ga. 820 (1999) (footnote omitted).

## B. Procedural History

On March 19, 1998, Petitioner "was found guilty of two counts of malice murder and two counts of felony murder." *Cook*, 270 Ga. at 820. "The jury recommended a death sentence for [Petitioner's] murder of Ms. Cartagena after finding that the murder of Ms. Cartagena was committed while [Petitioner] was engaged in the commission of the murder of Mr. Hendrickson." *Id*.

Petitioner filed a motion for new trial on March 23, 1998. (Resp't Ex. 2, p. 508-10, 515-77). The petition was denied on July 8, 1998. (Resp't Ex. 2, p. 578).

The Supreme Court of Georgia affirmed Petitioner's convictions and sentence of death on March 19, 1999. *Cook*, 270 Ga. at 831. Petitioner filed a motion for reconsideration that was

4

denied on April 2, 1999.  (Resp't Ex. 27, 28).

Petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court and the Court denied the Petition on November 1, 1999.  *Cook v. Georgia*, 528 U.S. 974 (1999).  The Court denied Petitioner's motion for rehearing on August 26, 2002.  *Cook v. Georgia*, 528 U.S. 1108 (2000).

On May 9, 2000, Petitioner filed a habeas corpus action in the Butts County Superior Court that challenged his conviction and sentence.  (Resp't Ex. 34).  Petitioner filed an amended petition on March 7, 2002.  (Resp't Ex. 47).  The court conducted an evidentiary hearing on October 8-9, 2002.  (Resp't Ex. 53-60).  The state habeas court denied the writ as to Petitioner's conviction but granted the writ as to the death sentence on October 2, 2007.  (Resp't Ex. 82).

On appeal, the Georgia Supreme Court affirmed the lower court's denial of relief as to the murder conviction, reversed the grant of sentencing phase relief, and reinstated Petitioner's death sentence on June 30, 2008.  *Schofield v. Cook*, 284 Ga. 240 (2008).   Petitioner's motion for reconsideration was denied on July 25, 2008.  (Resp't Ex. 104, 105).

On January 16, 2009, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court pursuant to 28 U.S.C. § 2254.     Both Petitioner and Respondent have briefed the issues of procedural default, exhaustion of state remedies, miscarriage of justice,[1] and the merits of the claims that Petitioner raised in his Petition for Writ of Habeas Corpus by a Person

---

[1]According to the procedural default rule, "a state prisoner seeking federal habeas corpus relief, who fails to raise his federal constitutional claim in state court, or who attempts to raise it in a manner not permitted by state procedural rules, is barred from pursuing the same claim in federal court." *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994).  There are two exceptions to the procedural default rule: (1) cause and prejudice and (2) fundamental miscarriage of justice.  *See Baldwin v. Reese*, 541 U.S. 27 (2004); *Hill v. Jones*, 81 F.3d 1015, 1022 (11th Cir. 1996) (citing *Harris v. Reed*, 489 U.S. 255 (1989)).  In relation to claims not addressed in Petitioner's brief and found to be procedurally defaulted by the state courts, this Court defers to the state courts' determinations of procedural default and finds that Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice to excuse any defaults.  *See Morris v. Kemp*, 809 F.2d 1499, 1503 (11th Cir. 1987).

in State Custody.[2]

## II. DISCUSSION

### A. Standard of review under 28 U.S.C. § 2254 (d)

Petitioner's federal habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which "'establishes a highly deferential standard for reviewing state court judgments'." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005)(quoting *Parker v. Sec'y for the Dep't of Corr*., 331 F.3d 764, 768 (11th Cir. 2003)); *Fotopoulous v Sec'y, Dep't of Corr*., 516 F.3d 1229 (11th Cir. 2008).   Under AEDPA, Congress prohibited district courts from granting habeas relief unless a state court's adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254 (d).

The "contrary to" clause of 28 U.S.C. § 2254 (d)(1) has been explained as follows:

> Under §2254(d)(1), "[a] state court's decision is 'contrary to' our clearly

---

[2]Petitioner initially submitted a brief consisting of 115 pages, and later filed a reply brief consisting of 61 pages.  Petitioner states that his briefs focus on Claims One, Two, Three, and Seven of his federal habeas corpus petition.  However, a review of these voluminous briefs shows that Petitioner actually focuses on Claims One and Seven only.  Petitioner states that he "does not abandon any of his other claims, set forth in his Petition, . . . but relies instead on factual and legal arguments contained in the petition itself and in briefing before the state courts in support of his claim that the Georgia Supreme Court's rulings as to those claims were contrary to and/or an unreasonable application of clearly established U.S. Supreme Court precedent and/or were based on unreasonable determinations of fact."  (Pet'r Sept. 30, 2009 Br., p. 6-7).  This Court addresses in detail only those Claims (One and Seven) that Petitioner focuses on in his briefs.  In relation to the various unaddressed Claims, the Court finds that Petitioner has not shown that the state courts' determinations regarding any of these Claims resulted in decisions that were "contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in . . . decision[s] that w[ere] based on an unreasonable determination[s] of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).

established[3] law if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent'."

***Michael v. Crosby***, 430 F.3d 1310, 1319 (11th Cir. 2005)(quoting ***Mitchell v. Esparza***, 540 U.S. 12, 15-16 (2003) and ***Williams v. Taylor***, 529 U.S. 362, 405-06 (2000)).  In contrast, "[a] state court's decision that applies the law as determined by the Supreme Court to the facts is not 'contrary to' whether or not the federal court would have reached a different result."  ***Carr v. Schofield***, 364 F.3d 1246, 1250 (11th Cir. 2004)(quoting ***Fugate v. Head***, 261 F.3d 1206, 1216 (11th Cir. 2001).  A federal district court cannot substitute its opinion for that of the state court and in situations in which there is no Supreme Court precedent on point, the federal court "'cannot say that the state court's conclusion . . . is contrary to clearly established federal law as determined by the United States'." ***Henderson v. Haley***, 353 F.3d 880, 890 (11th Cir. 2003)(quoting ***Isaacs v. Head***, 300 F.3d 1232, 1252 (11th Cir. 2002)).     The "unreasonable application" clause of 28 U.S.C. § 2254 (d)(1) has been explained as follows:

> [U]nder § 2254 (d)(1), a state court unreasonably applies Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." . . .  An unreasonable application also may occur if a state court unreasonably extends, or unreasonably declines to extend, a logical principle from Supreme Court caselaw to a new context.

***Michael***, 430 F.3d at 1319 (quoting ***Williams***, 529 U.S. at 407, 413).  The issue is not whether the state court applied federal law incorrectly; "relief is appropriate only if that application is

---

[3]"'Clearly established Federal law' consists of the 'holdings, as opposed to dicta, of the [United States Supreme] Court's decisions as of the time of the relevant state-court decision'." ***Newland v. Hall***, 527 F.3d 1162, 1183 (11th Cir. 2008) (quoting ***Williams v. Taylor***, 529 U.S. 362,412-13 (2000).  Moreover, "[c]learly established federal law is *not* the case law of the lower federal courts." ***Grossman v. McDonough***, 466 F.3d 1325, 1335-36 (11th Cir. 2006).

objectively unreasonable." *Id.* When attempting to determine if the state court's decision involved an unreasonable application of federal law, the federal district court need not decide if it "would have reached the same result as the state court if [it] had been deciding the issue in the first instance." *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1256 (11th Cir. 2002). Instead, the court merely "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409.

In addition to the two narrow "contrary to" and "unreasonable application of" prongs of AEDPA, § 2254 (d)(2) provides that a petitioner is also entitled to relief if the state court's conclusion is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(2). "'[A] determination of a factual issue made by a State court shall be presumed to be correct', and that the habeas petitioner has 'the burden of rebutting the presumption of correctness by clear and convincing evidence'." *Newland*, 527 F.3d at 1184 (quoting 28 U.S.C. § 2254 (e)). Finally, this Court must give deference to the state court's determinations regarding credibility. *Baldwin v. Johnson*, 152 F.3d 1304, 1317 (11th Cir. 1998).

**B. Claim One: Petitioner was deprived of his right to the effective assistance of counsel at trial, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *Strickland v. Washington*, 466 U.S. 668 (1984), and related precedent.**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court of the United States established the legal principles governing ineffective assistance of counsel claims. An ineffective assistance of counsel claim consists of two components: Performance and prejudice. "It is well established that a habeas petitioner must demonstrate both deficient performance and prejudice,

and that a failure with respect to either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v. Moore*, 234 F.3d 526 (11th Cir. 2000). Moreover, "'there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one'." *Randolph v. McNeil*, 590 F.3d 1273, 1276 (11th Cir. 2009)(quoting *Strickland*, 466 U.S. at 697).

The Eleventh Circuit Court of Appeals explained the performance analysis as follows:

> The petitioner satisfies the test's performance prong by proving that counsel's performance failed to meet the standard of "reasonableness under prevailing professional norms." Our evaluation of counsel's performance is highly deferential; we must "indulge a strong presumption" that counsel's performance was reasonable and that counsel "made all significant decisions in the exercise of reasonable professional judgment." We review counsel's performance "from counsel's perspective at the time," to avoid "the distorting effects of hindsight." Our review is objective, in that we consider whether there was any reasonable justification for the attorney's conduct. Thus, the "petitioner must establish that no competent counsel would have taken the action that his counsel did take."

*Newland,* 527 F.3d at 1184 (citations omitted).

If a petitioner shows that his counsel's performance was deficient, he still must show prejudice. "The petitioner satisfies the *Strickland* test's prejudice prong by showing that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome'." *Newland*, 527 F.3d at 1184 (quoting *Strickland*, 466 U.S. at 694). "The prejudice prong does not focus only on the outcome; rather to establish prejudice, the petitioner must show that counsel's deficient performance rendered the results of the trial fundamentally unfair or unreliable." *Rhode v. Hall*, 582 F.3d 1273 (11th Cir. 2009)(citing *Lockhart v. Fretwell*, 506 U.S. 364 (1993)).

In this case, Petitioner contends that, but for his counsels' errors, he would not have received a sentence of death.  In such a situation, the Court must "consider 'whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it indedendently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Newland*, 527 F.3d at 1184 (quoting *Strickland*, 466 U.S. at 695).  In a recent case, the United States Supreme Court explained that when determining if prejudice exists, "it is necessary to consider all the relevant evidence that the jury would have had before it if [Petitioner's counsel] had pursed a different path – not just the mitigation evidence [Petitioner's counsel] could have presented, but also the [aggravating evidence] that almost certainly would have come in with it." *Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009).

Along with the deference mandated by *Strickland*, the Court must keep in mind the deference that AEDPA requires.  Petitioner "must do more than satisfy the *Strickland* standard. He must show that in rejecting his ineffective assistance of counsel claim the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner'." *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004)(quoting *Bell v. Stone*, 535 U.S. 685, 699 (2002)).

1. Petitioner's claim that trial counsel was ineffective in his investigation and failure to present mental health evidence at the penalty phase of his trial

Petitioner raised this claim in the Butts County Superior Court during his state habeas proceedings.  That court concluded that "[t]rial counsel unreasonably failed to conduct an adequate investigation of Petitioner's background and mental health history; to understand what that history showed; to understand how it related to his culpability for these crimes; and to present that evidence to the jury."  (Resp't Ex. 82, p. 34).   The habeas court also determined that

Petitioner had established the second prong of **Strickland** and "had the available information and resources been effectively utilized, there is a reasonable probability that the result of the penalty phase would have been different." (Resp't Ex. 82, p. 49). The state habeas court, therefore, granted Petitioner's writ of habeas corpus "only with respect to the death sentence imposed." (Resp't Ex. 82, p. 58).

On appeal, the Supreme Court of Georgia, applying **Strickland**, reversed this aspect of the habeas court's decision and reinstated Petitioner's death sentence. That Court explained that it must "accept the habeas court's findings of fact unless they are clearly erroneous" and noted that "a large portion of the habeas court's order catalogues actions properly taken by trial counsel in pursuing the possibility of a mental health defense." **Schofield v. Cook**, 284 Ga. 240, 241 (2008). The Georgia Supreme Court went into great detail describing trial counsel's investigation into mental health evidence and explaining what this evidence revealed.

The Georgia Supreme Court agreed with the habeas court that counsel[4] realized early in their representation of Petitioner that a verdict of guilty was likely and therefore, they would have to focus much of their energy on the sentencing phase. **Id**. Almost immediately following his appointment, Mr. Wangerin met with Petitioner and Petitioner's father. (Resp't Ex. 53, p. 370). Counsel learned of Petitioner's background by interviewing him personally and speaking with family members. (Resp't Ex. 53, p. 370, 383, 410, 415). Petitioner told counsel of physical abuse

---

[4]The record shows that lead counsel, Kevin Wangerin, was appointed the day after Petitioner's arrest. (Resp't Ex. 53, p. 364). Mr. Wangerin had no previous death penalty experience, but he had represented other defendants charged with capital crimes. (Resp't Ex. 55, p. 1293). He had been practicing law for approximately five and one-half years. He had attended criminal continuing legal education courses; including one death penalty conference. (Resp't Ex. 55, p. 1293). Co-counsel, Thomas Wilson, was appointed "a couple of months" after Petitioner's arrest. (Resp't Ex. 55, p. 1376). He had been practicing criminal law for approximately nine years and had handled one previous death penalty case. (Resp't Ex. 55, p. 1397)

by his step father, but denied any sexual abuse. (Resp't Ex. 53, p. 370, 388).

Counsel "obtained a recommendation from expert death penalty litigators for a social worker." *Cook*, 284 Ga. at 242. Mr. Wangerin hired Ofelia Gordon to prepare a "psychosocial assessment." *Id.*; (Resp't Ex. 53, p. 378). Ms. Gordon's assessment shows that she met with Petitioner, a nurse at the Monroe County Jail, as well as Petitioner's father, brother, mother, and sister. (Resp't Ex. 56, p. 1633-48). Moreover, she obtained psychological records dating back to Petitioner's childhood.

The Georgia Supreme Court found that Ms. Gordon's report, which she shared with counsel, showed as follows:

> Cook had been a shy and awkward child but that his family life was essentially positive until his mother divorced Cook's father in 1981, when Cook was seven years old. The social worker described difficulties encountered when Cook's father remarried in 1983 and the fact that his father thereafter chose to live with his sons apart from his new wife for some time in an attempt to mitigate those difficulties. She reported that Cook was evaluated in 1984 at the age of nine because he was "emotionally exhausted" from the disruption in his family life and because he was having difficulty in school.
>
> She specifically described how Cook went to live with his mother, how his mother eventually remarried, how Cook's stepfather drank excessively and disliked Cook, and how Cook and his stepfather fought with one another. She reported that in 1989, which was around the time that his brother obtained a driver's license, Cook began demonstrating "antisocial behaviors," including burglarizing a neighbor's house and stealing and then fraudulently using a box of checks. These behaviors, she reported, led Cook's parents to hospitalize him at Coliseum Psychiatric Hospital for approximately five weeks, where the staff described him as "sad and angry" but not as having any delusions or thought disorders. She reported that as Cook grew older and after Cook's brother moved out, Cook's relationship with his stepfather worsened. His stepfather abused him emotionally and physically and even threatened to kill him. She reported that Cook committed another burglary after he was released from Coliseum Psychiatric Hospital and as a result, he was arrested and placed on probation for a year. She reported that Cook's mother divorced Cook's stepfather in 1994 and became "too lenient" with Cook in an attempt to compensate for Cook's previous living situation. She reported that in December 1994 Cook's mother had to sell her home, Cook took the loss of the home hard, and the murders occurred several days later.

> Finally, she reported that Cook claimed to have been hearing voices and he exhibited some seemingly paranoid thinking, but he did not appear to be delusional and she speculated that the murders could possibly have been the result of a "psychotic break."

***Cook***, 284 Ga. at 242-43.

Petitioner's counsel also had Petitioner's childhood psychological records. A psychological evaluation from Clinical Psychologist, Polly Paul McMahon, Ph.D., showed that in 1984, at the age of nine, Petitioner was a "sad and troubled youngster," who "strongly dislike[d] school." (Resp't Ex. 56, p. 1605). According to evaluation, he had "tried to stick something in his wrists" and had been known to "threaten hurting himself by putting a string around his neck and choking himself until he turns red." (Resp't Ex. 56, p. 1606). Dr. McMahon noted that his mother and father divorced in 1981 and that his father had remarried in 1983. (Resp't Ex. 56, p. 1605). She added that the parents "maintained excellent communication about their children" and listed his "excellent family support system" as Petitioner's major asset. (Resp't Ex. 56, p. 1609). Dr. McMahon reported that "many of his problems are related to his difficulties in school" and she recommended that he not be held back, but be placed in classes for learning disabled students and receive additional tutoring if necessary. (Resp't. Ex. 56, p. 1609). She noted that he was "emotionally exhausted with the stress of change in his life," but that his family was "doing a very fine job in working with [him]" and that the assistance in school (learning disabled classes and possible tutoring) would be beneficial. (Resp't Ex. 56, p. 1614).

Counsel also had records from Coliseum Psychiatric Hospital, where Petitioner, at age fifteen, was "admitted because of his 'increasingly severe behavior problems and episodes of marked oppositional violations of major social rules'." ***Cook***, 284 Ga. at 243. Regarding these 1989 records from the Coliseum Psychiatric Hospital, the Georgia Supreme Court found the

following facts, which are supported by a review of the evidentiary record:

> The psychologist who evaluated him at that time noted that he reported previously trying to commit suicide, but "'not very hard.'" The psychologist also reported that Cook was isolated and lethargic, that the disruption in his family life did not alone seem to explain the "underlying rage he [was] containing," and that "his oppositional behavior [was] severe." A psychiatrist who evaluated Cook noted his increasingly serious acts of misbehavior, including his shooting of a dog, stealing guns and blank checks, and carving his name in his arm with a razor blade. The psychiatrist specifically noted that Cook denied any history of physical or sexual abuse and that his relationship with his stepfather was, at that point, "fair." Cook's diagnoses upon discharge were major depression and oppositional defiant disorder and it was recommended that he take an anti-depressant and continue his individual and family therapy sessions. Cook did not receive follow-up treatment, however.

*Cook*, 284 Ga. at 243.

The psychological evaluation also described Petitioner as an "impulsive person," who "may react quickly with little hint that he has considered consequences;" that he "has difficulty accepting rules and laws; that he "must feel free that he can 'do his own thing and change rules as needed; that he "thrives on excitement," and that he "may eventually show an interest in weapons." (Resp't Ex. 56, p. 1619). The report showed that Petitioner had "a family who is quite concerned and expresses willingness to be involved in all aspects of his treatment." (Resp't Ex. 56, p. 1623).

Following his arrest, the trial court had Petitioner evaluated by Forensic Psychologist Dr. Jerold S. Lower, Ph.D.. Dr. Lower reported "memory problems and found they likely resulted from 'painful events in childhood'." *Cook*, 284 Ga. at 244. Dr. Lower noted that Petitioner's stepfather "attempted to kill him at age 13 and has mistreated him since." (Resp't Ex. 56, p. 1650). Petitioner reported suicidal thoughts but "never followed through with these and has made no attempts." (Resp't Ex. 56, p. 1650).

14

Additionally, Dr. Lower reported as follows:

> Personality testing was invalid.  The validity scale pattern suggested that he was consciously attempting to paint a somewhat overly virtuous picture of himself, while at the same time reporting a great deal of discomfort and distress. The overall profile was highly suggestive of an attempt to appear more disturbed than he actually is.

(Resp't Ex. 56, 1650).

Dr. Lower reported that Petitioner claimed to hear voices and "see[] things that are not present." (R. at 28, p. 1650).  Dr. Lower stated that "[a]ssuming he is telling the truth, these experiences do not closely resemble the hallucinations seen in acute mental illness."  (R. at 28, p. 1650A).   He also explained that "it appears Mr. Cook is not suffering from any sort of major psychiatric disorder" and "[o]ur impression is that he is deliberately attempting to manipulate our conclusions about him and to appear more psychologically disturbed than is actually the case." (R. at 28, p 1650A).

Mr. Wangerin explained that he "reviewed Dr. Lower's report, and saw that it wasn't favorable and at that point determined that [they] needed an independent evaluation." (Resp't Ex. 53, p. 427).  Mr. Wangerin, after consultation with death penalty experts at either the Multicounty Public Defenders Officer or the Southern Center for Human Rights, contacted Dr. Michael Shapiro, Ph.D..  The Georgia Supreme Court found as follows regarding Dr. Shapiro:

> Counsel informed their psychologist by letter that Cook claimed not to have a clear memory of the murders, that Cook claimed to remember only "flashbacks" in his dreams, and that there was some initial information suggesting Cook might not have been the killer. Accordingly, counsel informed their psychologist as follows:
>
> > The top concern I have is whether there is a psychological or physical neurological explanation of why Mr. Cook would have expressed an admission if he did not commit the crime.
> >
> > However, contrary to the habeas court's order, the record does not support a finding that counsel instructed their psychologist to limit his evaluation solely to this question. Instead, the psychologist's testimony shows that he conducted a

thorough neuropsychological examination. He, in his own words, conducted a "thorough interview" of Cook in person, and he administered over a dozen separate psychological tests. Counsel testified that he consulted with the psychologist after the examination to discuss the results, but that the psychologist told him that his diagnosis was antisocial personality disorder and that Cook was "a very angry young man."

Although counsel communicated with the psychologist only orally prior to trial, counsel asked the psychologist to memorialize his findings in a written report which was submitted to counsel after the trial. . . . The essential details of what conclusions the psychologist reached are contained within his testimony in the habeas record. He testified that he administered a personality inventory, but that he had to disregard the results because he believed Cook had attempted to manipulate the outcome. He testified that he ruled out schizophrenia and mood disorders, despite Cook's prior reports of hallucinations and treatment for depression and despite his description of his history of receiving prescription medications. He also testified that Cook denied past sexual and physical abuse, despite the notations in the report by the court's psychiatrist about Cook's claim of physical abuse by his stepfather. He testified that Cook admitted to exaggerating his past illegal drug use in his evaluation by the court's psychiatrist. He also testified that he was aware of the opinion of Cook's jail doctor that Cook had been faking his alleged hallucinations. . . .

*Cook*, 284 Ga. at 244-45.

With all of this mental health evidence, counsel made the strategic decision not to present any mental health experts during the trial.  The Georgia Supreme Court explained as follows:

As trial approached, counsel consulted with their own psychologist to consider whether to present mental health evidence in the sentencing phase of trial. By this time, they had been presented reports, both oral or written, from various experts that showed Cook's history of serious misconduct, prior diagnoses of not only major depression but also of oppositional defiant disorder and antisocial personality disorder, and a history of Cook's likely malingering and attempts to mislead experts who examined him after his arrest. Counsel testified that, "in the end, it was decided not to put up these mental health experts because I thought that it would end up doing more damage than good."

*Id*. at 241-46.

These findings regarding counsel's investigation into the mental health evidence and resulting decision not to present mental health testimony are supported by the voluminous record and are certainly not "unreasonable."  28 U.S.C. § 2254 (d)(2).  Although counsel obviously

investigated mental health evidence, the Georgia Supreme Court agreed with the state habeas court that counsel failed to learn of one evaluation: Petitioner's 1997 evaluation and treatment at the River Edge Behavioral Health Center (hereinafter "River Edge") while he was in the Monroe County Jail awaiting trial. As counsel did not have these records, he did not provide them to his mental health expert–Dr. Shapiro. *Cook*, 284 Ga. at 246. Given this failure, the Georgia Supreme Court decided to assume counsel's investigation into mental health evidence was insufficient. *Id*.

Unlike the state habeas court, however, the Georgia Supreme Court concluded that Petitioner failed to show "sufficient prejudice to warrant success of his overall ineffective assistance claim." *Id*. After a thorough review of the record and the arguments of the parties, this Court finds that this ruling is supported by the record and that the Georgia Supreme Court's decision to deny relief on this claim did not involve "an objectively unreasonable application of the *Strickland* standard." *Hammond v. Hall*, 586 F.3d 1289, 1324 (11th Cir. 2009).

Petitioner claims that the Georgia Supreme Court's "decision constitutes an unreasonable application of *Strickland*" because it "completely overlook[s] trial counsel's positive response to the River Edge material." (Pet'r Sept. 30, 2009 Br., p. 67-68). According to Petitioner, the River Edge material "would have prompted trial counsel to reconsider his decision not to present mental health evidence." (Pet'r Sept. 30, 2009 Br., p. 68). This is not how counsel testified at the state habeas evidentiary hearing. Mr. Wangerin explained that he did "not know that [the River Edge] report . . . would change [his] determination [not to present mental health evidence] in and of itself." (Resp't Ex. 53, p. 419). Counsel pointed out that while Dr. Figaro's report was beneficial, "it still ha[d] to be weighed against the other information out there." (Resp't Ex. 53, p. 425).

17

Petitioner also claims that the Georgia Supreme Court "unreasonably applied . . . *Strickland* . . . in concluding that Dr. Shapiro's potential testimony was the sole deciding factor in determining prejudice." (Pet'r Sept. 30, 2009 Br., p. 69). However, the state court did not consider only Dr. Shapiro's[5] potential testimony when determining prejudice. Instead, it is obvious the Georgia Supreme Court reviewed the total record when making its determination. The court reviewed all of the psychological evaluations and reports described above and also reviewed and explained the River Edge Report as follows:

> In 1997, while Cook was incarcerated and awaiting trial, jail personnel sent Cook to River's (sic) Edge Behavioral Health Center for evaluation and treatment. The records show that during his two visits to River's (sic) Edge, Cook indicated that he was suffering from sleep problems, anxiety, depression, and audio and visual hallucinations. Although the initial diagnostic impression in the records indicates possible malingering and antisocial personality disorder, the discharge summary, written after Cook discontinued his own treatment, omits these items and lists solely the diagnostic code for major depression with psychotic features. The records also indicate that during this evaluation Cook claimed to have been physically abused by his stepfather and to have been sexually abused by a relative. Cook was given several prescriptions based on his claimed symptoms of sleep problems and hallucinations.

*Cook*, 284 Ga. at 245-46.

The Court pointed out that "[w]ith the exception of Cook's new claim of sexual abuse, everything contained in the River Edge records was already known to counsel and the defense expert" and that Dr. Shapiro testified the River Edge evaluation would not substantially change his opinion. *Cook*, 284 Ga. at 247. The Georgia Supreme Court did not end its analysis here however. Instead, it explained as follows:

---

[5]Even if defense counsel decided not to use Dr. Shapiro and could have kept out any of his negative testimony, as Petitioner argues, there is plenty other aggravating mental health evidence that would have been introduced had counsel opted to introduce mental health evidence in mitigation. This evidence paints the picture of a person who is manipulative (R. at 28, p. 1650A); "attempt[s] to appear more disturbed than he actually is" (Resp't Ex. 56, p. 1650); has difficulty accepting rules (Resp't Ex. 56, p. 1619); lies, and acts on impulse. (Resp't Ex. 56, p. 1619).

Furthermore, even assuming, arguendo, Cook's claim of sexual abuse would have prompted further evaluation by Cook's psychologist at the time of trial and that it would have led that psychologist to give testimony comparable to that of Cook's expert in the habeas proceedings, we find the evidence of prejudice insufficient to sustain his ineffective assistance of counsel claim. Given Cook's history of suspected malingering in mental health evaluations and his previous denials of sexual abuse, his claim of abuse made for the first time while in jail awaiting his death penalty trial likely would have appeared dubious to the jury. Although there is no direct testimony about what abuse actually occurred, we note that Cook's expert on habeas testified that the details of the alleged abuse came from Cook himself and that Cook reported one incident of abuse where a sister had him suck on her nipples when he was seven or eight years old and another incident in which he is not sure who the perpetrator was and about which no details were provided. Based on his analysis, this expert concluded that Cook suffered from recurrent major depression, dysthymic disorder, and post-traumatic stress disorder as a result of his family background and his alleged sexual abuse by his sister and his possible additional sexual abuse by some unnamed relative. Cook's new expert stated his belief that Cook saw the victims in this case kissing, which "reactivate[d] for him the abuse situation with [his sister]," which "activate[d] the rage that he had" because of his stepfather, which led him to fall into a dissociative state in which he murdered the victims, and which caused an impaired memory of the murders. Such a theory, even assuming counsel could have presented it at trial through his own expert who refused to adopt it in his habeas testimony, would not have had a strong impact on the jury in light of the totality of the evidence. Cook's claim of sexual abuse would have been undermined by the habeas testimony of his sister in which she strongly denied Cook's claim of abuse. Thus, we find the jury likely would have found the expert's theory to be based on suspect facts and contrary to the substantial evidence showing that Cook deliberately planned the murders and that Cook remembered his crime and confessed to multiple persons, even explaining that he committed the murders simply to see if he could get away with it.

*Cook*, 284 Ga. at 247-48.

Petitioner also claims that the Georgia Supreme Court, when finding a lack of prejudice, ignored favorable mental health testimony from individuals such as Dr. Patrice Webster, the treating clinician at Colisuem Psychiatric Hospital, and Beverly Owenby, the nurse at the Monroe County Jail.  (Pet'r Sept. 30, 2009 Br., p. 69).  Petitioner claims that their testimony, along with the River Edge Report "would likely have altered the outcome of the sentencing phase."  (Pet'r Sept. 30, 2009 Br., p. 69).  However, the record shows the Georgia Supreme Court did not ignore such testimony.  Instead, the court discussed the 1989 evaluation from the Coliseum Psychiatric Hospital and, as noted above,  it contained many details that were potentially harmful to the

19

defense. ***Cook***, 284 Ga.243.  Additionally, any helpful information that nurse Owenby may have been able to provide would have been minimized by the testimony of Dr. Patton Paul Smith, the doctor at the jail, who testified that Petitioner was "manipulative" while incarcerated at the Monroe County Jail and, specifically, that nurse Owenby "was manipulated by Mr. Cook."[6] (Resp't Ex. 54, p. 515).

Petitioner relies on a recent Supreme Court case, ***Porter v. McCollum***, 130 S. Ct. 447 (2009), to support his theory that counsel's deficient performance prejudiced him.  However, this case is easily distinguished from ***Porter***.  Specifically, the mitigation evidence presented during Porter's post-conviction proceedings was much stronger than that presented here.  The United States Supreme Court explained that had Porter's counsel conducted any type of investigation[7] and presentation of evidence, the judge and jury would have learned of "(1) Porter's heroic military service in two of the most critical – and horrific – battles in the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." ***Id***. at 454.  The Supreme Court explained that "evidence of Porter's abusive childhood . . . may have particular salience for a jury evaluating Porter's behavior" in this crime of passion against his ex-girlfriend. ***Id***. at 455.  Additionally, the Court stressed the importance of Porter's military service because "[o]ur Nation has long tradition of according leniency to veterans in recognition of their service, especially those who fought on the front lines as Porter did." ***Id***.

---

[6]Petitioner admitted to Dr. Jay Jackman, the expert forensic psychiatrist who examined him and testified at his state habeas hearing, that he did manipulate and lie to jail personnel.  Specifically, Petitioner stated that while in the Monroe County Jail, he "said he saw things when he didn't."  (Resp't Ex. 54, p. 977).  This is how he was able to see Dr. Figaro at River Edge.  (Resp't Ex. 53, p. 296).

[7]The Court points out also that the investigation conducted in ***Porter*** was far more limited than that undertaken in this case.  Porter's trial "counsel did not even take the first step of interviewing witnesses or requesting records." ***Porter***, 130 S. Ct. at 453.  In fact, counsel had only one meeting with Porter prior to the trial.  Conversely, in this case, Petitioner's counsel met with Petitioner and family members on numerous occasions, hired a social worker to prepare a psychosocial assessment, reviewed numerous mental health records, and had Petitioner examined by a mental health expert.

Here, however, the jury did hear testimony that Petitioner was emotionally and physically abused by his stepfather. Much of the mental health evidence presented at the state habeas hearing was, as noted above, contradictory and potentially harmful to Petitioner. Furthermore, it has not been suggested the Petitioner committed a crime of passion for which his alleged abuse by his stepfather would have been "paricular[ly] salien[t]." *Id.* at 455. Finally, Petitioner certainly would not have been due any leniency for military service; much less service on the front lines of "the most critical – and horrific – battles" of a war. *Id.* at 454.

Petitioner also cites *Wiggins v. Smith*, 539 U.S. 510 (2003) to support his theory that he was prejudiced by his counsel's deficient investigation. However, just as with *Porter*, the mitigating evidence introduced at Wiggins post-conviction proceeding was far stronger than that found here. Specifically, Wiggins alcoholic mother "left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage." *Id.* at 516-17. His mother regularly beat him; had sex with various men while he slept in the same bed; and once forced his hand against a hot stove burner, which burned him so badly he had to be hospitalized. *Id.* at 517. After he was taken from his mother and placed in foster care, he was physically abused and repeatedly raped and molested by the father in the second foster home in which he was placed. *Id.* In a later foster home setting he was "gang-raped . . . on more than one occasion." *Id.* Finally, in a Job Corps program, he was sexually abused by his supervisor. *Id.*

The Supreme Court of the United States explained that "[i]n assessing prejudice we reweigh the evidence in aggravation against the totality of available mitigating evidence. In this case, our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis." *Id.* at 534. Conversely, in the current case, this Court is "circumscribed by [the] state court conclusion with respect to prejudice." *Id.* The Court can grant relief only if Petitioner shows that "'in rejecting his ineffective assistance of counsel claim the state court applied *Strickland* to the facts of the case

in an objectively unreasonable manner'." ***Blankenship v. Hall***, 542 F.3d 1253, 1271 (11th Cir.

2008)(quoting ***Rutherford v. Crosby***, 385 F.3d 1300, 1309 (11th Cir 2004).    Based on the

"totality of the evidence–'both adduced at trial, and the evidence adduced in the habeas

proceeding'," this Court cannot make such a finding. ***Wiggins***, 539 U.S. at 536.

   2. Petitioner's claim that trial counsel was ineffective in his investigation and presentation of life history or background evidence at the penalty phase of his trial

   The record shows that trial counsel investigated Petitioner's life history and background.

Mr. Wangerin spoke with Petitioner and his family members on numerous occasions, hired a

social worker to prepare a detailed "psychosocial assessment," and hired an investigator (R. F.

Warner) to track down witnesses.  (Resp't Ex. 53, p. 370, 378, 383, 457).  Petitioner's family,

friends, and ex-girlfriends were all contacted and interviewed.  (Resp't Ex. 53, p. 370, 378, 465).

Moreover, the social worker obtained, and provided to trial counsel, information from Petitioner's

family, jail personnel, school records, and childhood psychological records . (Resp't Ex. 56, p.

1633-48).

   After the investigation, trial counsel explained that they considered "getting into the

mental evaluation, and we determined that was not the proper way to go." (Resp't Ex. 53, p. 409).

Moreover, they considered calling "not only other family members but people [Petitioner] went

to school with." (Resp't Ex. 53, p. 409).  Counsel determined not to call certain witnesses because

their testimony was irrelevant or potentially harmful.  (Resp't Ex. 53, p. 465).  Mr. Wangerin

explained that his sentencing strategy revolved around Petitioner's father, John Cook.  He testified

as follows:

> The other part of the evaluation was that it was clear to me in his sentencing phase,
> or what I believe clear in the sentencing phase was that Andrew Cook had been
> convicted largely on the testimony of his father.
>
>  And it was going to be up to his father to plea for his life, and that was
> going to be the most effective testimony to save Andrew Cook from the death
> penalty.

(Resp't Ex. 53, p. 406-07)

Mr. Wangerin stated that "[i]t was [his] belief that John Cook was to the jury the most important witness, and it was [his] belief that if John Cook got up and made an unabashed plea to save his son from the death penalty, that . . . would have the most powerful effect on the jury." (Resp't Ex. 53, p. 410).

In accordance with this strategy, counsel decided to call Petitioner's mother, sister, and father during sentencing. Petitioner's mother, Sandra Sewell, testified that she and Petitioner's father divorced when he was "around eight years old." (Resp't Ex. 17, p. 1797). She stated that when she remarried, her new husband and Petitioner initially had a good relationship. However, their relationship deteriorated and "[t]here became lots of arguments." (Resp't Ex. 17, p. 1799). She explained that Petitioner's step-father found fault with everything Petitioner did and the tension between the two of them resulted in physical violence or "violent confrontations" "[s]everal times." (Resp't Ex. 17, p. 1799-1800). She also explained that after she divorced Petitioner's step-father she could no longer afford their home and Petitioner took the loss of the house very hard. (Resp't Ex. 17, p. 1802). She asked the jury to spare Petitioner's life and stated that she had "failed him," "robbed him of a normal child life," and that "remarrying a man and staying in a situation where [Petitioner] was beaten, where he was verbally abused, . . . was wrong on [her] part." (Resp't Ex. 17, p. 1802).

Petitioner's sister, Debbie Pope, explained that she loved Petitioner, visited him each week in jail and understood Petitioner might "be in jail for the rest of his life." She begged the jury to spare his life. (Resp't Ex. 17, p1804-06).

Petitioner's father, John Cook, testified that Petitioner "had some tough times." He stated that Petitioner's heart was not "totally malignant," that there was "value somewhere in him" and that there was "goodness in him." (Resp't Ex. 17, p. 1802). He explained to the jury that he loved

his son and deeply regretted that he had to testify against his him during the trial.  (Resp't Ex. 17, p. 1814).  However, he explained that Petitioner did not hold the testimony against him and that Petitioner expressed concern and love for him; even after the testimony. (Resp't Ex. 17, 1806-18).

The Georgia Supreme Court addressed this particular ineffective assistance of counsel claim and stated "we hold both that trial counsel did not perform deficiently in preparing and presenting evidence of Cook's background and that counsel's failure to present additional evidence of the kind Cook now proposes did not create prejudice sufficient to warrant the success of his overall ineffective assistance of counsel claim." *Cook*, 284 Ga. at 249.

Petitioner claims that this aspect of the Georgia Supreme Court's decision was based on an unreasonable determination of the facts because "the evidence presented in the habeas proceedings introduced ample previously untold information about [Petitioner's] lifelong struggle with mental illness and his deprived upbringing."  (Pet'r Sept. 30, 2009 Br., p. 75).  Moreover, Petitioner states that the Georgia Supreme Court's prejudice analysis constituted an unreasonable application of *Strickland* because it "assume[d] that if some mitigating evidence was presented at sentencing, no matter how minimal or cursory, anything new presented in habeas proceedings along the same thematic lines [was] 'cumulative'."  (Pet'r Sept. 30, 2009 Br., p. 75-75).

However, the record supports the Georgia Supreme Court's findings.  Moreover, the Georgia Supreme Court did not merely base its finding regarding a lack of prejudice on the fact that the evidence offered at the state habeas evidentiary hearing was cumulative.  Instead, it "consider[ed] **all** of the relevant evidence the jury would have had before it . . . the entire body of mitigating evidence . . . against the entire body of aggravating evidence." *Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009).  It explained as follows:

24

> Counsel could have conceivably introduced additional testimony of the sort highlighted in the habeas court's order showing how [Petitioner's] parents had not always provided him a stable and happy home life and how his mental health and behavioral problems could have been more aggressively addressed. However, we do not find that the lay testimony concerning Cook's background that counsel actually presented was unreasonable in light of the circumstances, particularly because so much of the additional lay testimony [Petitioner] now proposes could have alienated and jury and led to unfavorable cross-examination and the presentation of unfavorable witnesses by the State.

*Cook*, 284 Ga. at 249.

Specifically, the record shows some of this potentially unfavorable evidence to include that Petitioner had a fascination with guns and pulled a gun an a group of people in a parking lot (Resp't Ex. 54, p. 517); that he broke his brother's jaw (Resp't Ex. 53, p. 474-75); that he had only a few friends and was quick to "blow up and snap" (Resp't Ex. 54, p. 532); that he was unpredictable (Resp't Ex. 54, p.518-19); that people were scared of him and did not want him to know where they lived (Resp't Ex. 54, p.518-19); and that he broke into a vehicle and into homes (Resp't Ex. 54, p. 519). Petitioner faults the Georgia Supreme Court for taking into consideration the negative testimony that might have been introduced. However, just such analysis of the totality of the evidence is proper under *Strickland*. The United States Court of Appeals for the Eleventh Circuit has recently reiterated that a prejudice argument must be "rejected . . . where mitigation evidence was a "two-edged sword" or would have opened the door to damaging evidence'."*Cumming v. Sec'y for the Dept. of Corr*., 588 F.3d 1331, 1367 (11th Cir. 2009(quoting *Wood v. Allen*, 542 F.3d 1281, 1313 (11th Cir. 2008); *See also Wong*, 130 S. Ct. at 390 (explaining that "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice").

Petitioner also cites *Williams v. Taylor*, 529 U.S. 362 (2000) for support. However, the facts in this case are easily distinguished from those in *Williams* and trial counsels' conduct in this

case is simply not analogous to the conduct held to be ineffective in ***Williams***.  Specifically, in

***Williams***, trial counsel "failed to conduct an investigation that would have uncovered extensive

records graphically describing Williams' nightmarish childhood, not because of any strategic

calculation but because they incorrectly thought that state law barred access to such records." *Id*.

at 419.  Counsel failed to discover records showing Williams had been "severely and repeatedly

beaten by his father." ***Id.***  Moreover, records showed both of his parents were imprisoned for two

years for criminal neglect of Williams and his siblings and that during their incarceration,

Williams had to endure an abusive foster home. ***Id***.  Additionally,

> [c]ounsel failed to introduce available evidence that Williams was "borderline
> mentally retarded" and did not advance beyond sixth grade in school.  They failed
> to seek prison records recording Williams' commendations for helping to crack a
> prison drug ring and for returning a guard's missing wallet, or the testimony of
> prison officials who described Williams as among the inmates "least likely to act
> in a violent, dangerous or provocative way." Counsel failed even to return the
> phone call of a certified public accountant who had offered to testify that he had
> visited Williams frequently when Williams was incarcerated as part of a prison
> ministry program, that Williams "seemed to thrive in a more regimented and
> structured environment," and that Williams was proud of the carpentry degree he
> earned while in prison.

*Id*. at 419-20.

Instead, during the sentencing phase of William's trial, counsel chose to focus on the fact

that Williams had confessed.  Additionally, "[t]he weight of defense counsel's closing . . . was

devoted to explaining that it was difficult to find a reason why the jury should spare Williams'

life." ***Id.*** at 403.

Unlike Williams' attorneys, Petitioner's trial counsel conducted an extensive investigation

into Petitioner's background.  Furthermore, based on this investigation, counsel chose a specific

strategy for mitigation.  Nothing in ***Williams*** requires Petitioner's  trial counsel to present any

mental health evidence or any additional lay witnesses to discuss Petitioner's background. As the Eleventh Circuit Court of Appeals has explained, "*Williams* creates no mechanistic rule of law at all for investigation or for presentation of evidence in capital cases." *Chandler v. United States*, 218 F.3d 1305, 1317 n.21 (11th Cir. 2000). Put simply, "*Williams* cannot command the outcome for this case; the cases' facts are materially different, allowing different outcomes under *Strickland*." *Chandler*, 218 F.3d at 1317 n.21.

The Court of Appeals for the Eleventh Circuit has explained that "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Walter v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)(en banc). Moreover, "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called . . . . But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance." *Putman v. Head*, 268 F.3d 1223, 1245 (11th Cir. 2001). "It is well established in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented." *Van Poyck v. Florida Dep't of Corr.*, 290 F.3d 1318, 1324 (11th Cir. 2002) (per curiam). Keeping these well-established principles in mind and applying the deference that this Court must to the decision of the state court, the Court finds that it must deny relief on this particular ineffective assistance of counsel claim.

3. Petitioner's claim that trial counsel was ineffective in his lack of work with the key witness for both the guilt/innocence phase and penalty phase of the trial–John Cook

Petitioner maintains that trial counsel failed to prepare John Cook for the penalty phase of the trial and, "[i]f he had been better prepared, there is a reasonable probability that the jurors would not have sought death." (Pet'r Sept. 30, 2009 Br., p. 97).[8] The Georgia Supreme Court addressed this issue and held that "trial counsel did not perform deficiently and that counsel's failure to prepare [Petitioner's] father in a different manner did not create prejudice sufficient to warrant the success of his overall ineffectiveness of counsel claim." *Cook*, 284 Ga. at 250.

The record shows that trial counsel considered John Cook to be the most important mitigation witness and Mr. Wangerin met with him on several occasions. (Resp't Ex. 53, p. 407). Mr. Wangerin explained that he thought John Cook's testimony "was going to be the most effective testimony to save [Petitioner] from the death penalty." (Resp't Ex. 53, p. 407). Mr. Wangerin stated that he "tried to stress to Mr. Cook . . . that it was [his] belief that this was a choice between the death penalty and a life without parole case . . . and that is where his testimony needed to focus." (Resp't Ex. 53, p. 410). Additionally, trial counsel stated that he did not "ask [John Cook] verbatim what he was going to say." (Resp't Ex. 53, p. 410). He explained as follows:

> You say that I did not know what he was going to say which is true, I mean, I didn't have a transcript of what he was going to say. Okay? We had discussed that he was going to be put on the stand and it was basically going to be up to him to plea for [Petitioner's] life, and in my mind, this was a case that plea should be for a life without parole sentence, not the death penalty, that I didn't think it was a life situation, where he could get a life sentence.

_____

[8]To any extent that Petitioner makes a separate and district claim that trial counsel was ineffective because he "failed to thoroughly investigate[] John Cook's role in the investigation" of the murders, Petitioner has failed to assert how the state court's finding with regard to trial counsel's investigation into Mr. Cook's role was an unreasonable application of law or based on any unreasonable determinations of fact. (Pet'r Sept. 30, 2009 Br., p. 91). The Georgia Supreme Court found that Mr. Cook had never worked in an investigatory capacity on the case. Petitioner has not shown this to be an unreasonable factual finding.

But yes, I left it up to John Cook as to the exact words he was going to say, and answers to my questions, that was up to John Cook. I did not try and put any testimony in his mouth.

(Resp't Ex. 53, p. 442).

The Georgia Supreme Court found as follows:

In the sentencing phase, Cook's father gave moving testimony. He began as follows: "Yesterday, of course, I sat up here as a cop. And now I'd like to tell you a little bit about Andy as the father." He explained to the jury how his son was already dead in some ways and how Cook, along with his family, now must live in shame. He explained that he felt he had failed "to protect his own son from the evil." He urged the jury to consider that justice without "compassion or mercy" was mere vengeance, which he said should belong to God alone. He testified that he was uncertain whether death or life without parole was the more severe punishment, and he urged the jury to consider if Cook might now have or might ever have "something of value in him" that might warrant the possibility of parole.

Cook argues that the reference to life without parole possibly being worse than death prejudiced his defense. Many jurors, however, may have been moved by the forthrightness of Cook's father. Moreover, regardless of the opinion of Cook's father about life without parole, this testimony may have prompted many jurors to consider whether any residual value in Cook could justify his continued existence, even if he were incarcerated without the possibility of parole.

Cook's father further recounted how his son called him after his guilt/innocence phase testimony to tell him that he was proud of him, that he had done the right thing, and that he loved him. Cook's father asked the jury to close their eyes, to remember the victims' families, to think of him and the rest of Cook's family, and to picture themselves on their knees before God. He concluded by telling the jury that Cook had tried to enter a guilty plea "to save everyone from having to open these sores and feel this pain." Testimony in the habeas court proceedings indicates that most persons in the courtroom, including counsel and jurors, were in tears during this testimony.

*Cook*, 284 Ga. at 249-50 (footnotes omitted).

These findings are supported by the record and Petitioner has not shown that the Georgia Supreme Court's decision contains any unreasonable determinations of fact based on the evidence presented. Moreover, Petitioner has not shown that in rejecting this particular ineffective assistance of counsel claim the state court "'applied ***Strickland*** to the facts of his case in an objectively unreasonable manner'." ***Rutherford v. Crosby***, 385 F.3d 1300, 1309 (11th Cir.

2004)(quoting ***Bell v. Stone***, 535 U.S. 685, 699 (2002)).

    4. <u>Petitioner's claim that trial counsel's lack of investigation for the guilt/ innocence phase of his trial was unreasonably deficient and prejudiced Petitioner</u>

    In this claim, Petitioner first maintains that counsel "did not investigate any defenses involving Mr. Cook's psychological state before, leading up to, nor during the murders for which he was charged." (Pet'r Sept. 30, 2009 Br., p. 107). Petitioner alleges that had certain mental health defenses been raised during the guilt/innocence phase of his trial, he "would have been found not guilty by reason of insanity,[9] guilty but mentally ill or guilty of lesser crimes." (Pet'r Sept. 30, 2009 Br., p. 107-108).

    The Georgia Supreme Court held as follows regarding this argument:

> Cook argues that the habeas court erred by failing to address in the ineffective assistance claim whether potential mental health evidence could have supported a verdict of guilty but mentally ill. We have held that "the statute that provides for a verdict of guilty but mentally ill does not preclude a death sentence as the result of such a verdict." Accordingly, the habeas court did not err in failing to address the merits of Cook's claim beyond addressing the role that potential mental health evidence might have played as mitigating evidence in the sentencing phase, which we addressed above.

***Cook***, 284 Ga. at 251 (quoting ***Lewis v. State***, 279 Ga. 756, 764 (2005)(in which the Georgia Supreme Court explained that while a finding of mental retardation does preclude the death penalty, a verdict of guilty but mentally ill does not preclude the imposition of the death penalty)).

    As this Court explained above, trial counsel did investigate Petitioner's mental health. They obtained psychological records from his childhood, the trial court had him examined by a mental health expert, and after trial counsel reviewed this report, they had Petitioner examined by a separate mental health expert. Furthermore, even had counsel decided to present evidence of mental illness and had Petitioner found "guilty but mentally ill," this would not have precluded

---

[9]Petitioner has presented no evidence that he meets the standard of not guilty by reason of insanity.

the death sentence.  Therefore, as the state court found, the relevant issue is the role that mental health evidence would have played during the mitigation phase of the trial and the Court has already discussed this issue at length above.

Petitioner also states that trial counsel was ineffective because he failed to pursue appointment of a crime scene expert to testify at the guilt/innocence phase of the trial.  According to Petitioner, such an expert could have explained "how the State's evidence, including the nature of the gun shots, the duration of the crime, and the confessions [] Mr. Cook made to his father, fit an unplanned crime, lacking any forethought, and motivated not by sexual intent but by rage."  (Pet'r Sept. 30, 2009 Br., p. 114).

To show prejudice from counsel's failure to hire a crime scene expert, Petitioner points to an affidavit from forensic investigator R. Robert Tressel that he submitted during the state habeas proceedings.  Mr. Tressel opined as follows: (1) the Lake Juliette murders were "a chaotic and unorganized crime, which occurred very quickly"  (Resp't Ex. 55, p. 1245); (2) there was no motive for the crime (Resp't Ex. 55, p. 1249); (3) "[i]n [his] professional opinion this [was] not a sex crime" and was instead a "crime fueled by rage";  (Resp't Ex. 55, p. 1251); and (4) Petitioner's statements to his father were consistent with the crime scene.  (Resp't Ex. 55, p. 1252).  According to Petitioner, this testimony "would have assisted a jury in understanding the connection between [Petitioner's] mental illness and the nature of the crime."  (Pet'r Sept. 30, 2009 Br., p. 114).

The Georgia Supreme Court considered this claim and found as follows:

> Cook also argues that the habeas court erred by failing to address whether trial counsel were ineffective for failing to employ a crime scene expert. We find, however, that the testimony Cook presented in his habeas proceedings would have had no net positive effect on the jury's deliberations, as that testimony concerned

31

matters of common sense and matters that could easily have proven to be more harmful than beneficial to his defense. Accordingly, we conclude that as to this claim, Cook has failed to show either deficient performance or prejudice to his defense.

*Cook*, 284 Ga. at 251.

The Court, like the Georgia Supreme Court, fails to see how, given the evidence that was actually presented at the trial, Petitioner was prejudiced by his attorneys' failure to hire an expert to testify that these crimes were unplanned, disorganized, and without any motive other than Petitioner's rage. Given the testimony that was presented, the jury certainly could have reached conclusions of this nature without the help of a crime scene expert. Moreover, the Court agrees that this evidence "could easily have proven to be more harmful than beneficial." *Id*. In short, this Court finds that the Georgia Supreme Court's decision regarding this issue is based on reasonable factual determinations and the state court conducted a reasonable application of *Strickland*.

**C. Claim Seven: The trial court improperly admitted coerced and involuntary statements made by Petitioner to his father, a federal law enforcement agent, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**

Petitioner maintains that, without being advised of his right to remain silent or right to request an attorney, he was twice (on December 4, 1996 and again on December 5, 1996) interrogated by his father, Federal Bureau of Investigations (hereinafter "FBI") Special Agent John Cook, who was a supervisory agent for the FBI at the time. According to Petitioner, these interrogations violated the Fifth Amendment and should have been excluded from the trial.[10]

---

[10]Petitioner also states that "[m]ore shocking and prejudicial was the debilitating prohibition of trial counsel to cross examine witnesses about the lack of *Miranda* warnings, which left counsel with a non-existent defense against at least two confessions." (Pet'r Sept. 30, 2009 Br., p. 100). Petitioner claims that "if jurors had heard the circumstances in which [Petitioner's] confessions were obtained, they would have likely reached a different conclusion regarding the balance between aggravating and mitigating factors." (Pet'r Sept. 30, 2009

### 1.  The December 4, 1996 phone call

The record shows that on December 4, 1996, Georgia Bureau of Investigations (hereinafter "GBI") Agent Randy Upton contacted John Cook and requested that he assist him in locating Petitioner.  (Resp't Ex. 16, p. 1349).  Randy Upton informed Mr. Cook that he wanted to ask Petitioner some "questions concerning the Lake Juliette homicides."  (Resp't Ex. 16, p. 1350). Prior to that,  Mr. Cook had no idea that Petitioner was being considered a suspect in these murders.  (Resp't Ex. 16, p. 1350). Mr. Cook explained that he only knew about the murders "by what [he had] read in the paper."  (Resp't Ex. 16, p. 1350). Mr. Cook said that the FBI "had done a little bit of work to assist the Monroe County Sheriff's Office in covering some leads out of the general area [,] . . . [b]ut [he] had not personally worked on the case at all."  (Resp't Ex. 16, p. 1350).

John Cook paged his son several times and  finally spoke with him that night around 11:00 p.m..  Mr. Cook asked Petitioner if he knew anything about the Lake Juliette murders.  (Resp't Ex. 16, p. 1351).  Petitioner responded that he could not tell John Cook, because John Cook was "one of them"; he was "a cop."  (Resp't Ex. 16, p. 1351).  John Cook explained that he was a "father first" and asked if Petitioner was at Lake Juliette that night.  Petitioner responded that he was.  (Resp't Ex. 16, p. 1351).  Mr. Cook then asked Petitioner if knew who shot the victims and Petitioner said that he did know.  (Resp't Ex. 16, p. 1351).  Mr. Cook thought that perhaps Petitioner "was just there and saw what happened."  (Resp't Ex. 16, p. 1351).  Mr. Cook then

---

Br., p. 107).  Petitioner presents no further argument or support for this statement.  The Georgia Supreme Court found that  the trial court erred when it failed to allow the defense to cross examine the witnesses about the confessions.  *Cook*, 270 Ga. at 828.  However, the Court found "that the error [was] harmless."  *Id*.  Petitioner has not shown that this decision was based on any unreasonable finding of the facts; or that it was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254 (d).

asked if he shot the victims and Petitioner responded that he did.  (Resp't Ex.16, p. 1351).

Petitioner explained to his father that he shot the victims in self-defense and later realized that the

victims had just a pellet gun.  (Resp't Ex. 16, p. 1352).  John Cook tried to persuade Petitioner to

"come in and tell authorities this."  (Resp't Ex. 16, p. 1353).  Petitioner replied that he was going

to run and "just disappear."  (Resp't Ex. 16, p. 1353).  Mr. Cook told him that he could not

disappear because "eventually, we'll find you."  (Resp't Ex. 16, p. 1353).  Mr. Cook did not know

from where Petitioner was calling him and urged him not to run or commit suicide.  (Resp't Ex.

16, p. 1354).  Mr. Cook told Petitioner that he would "work with authorities and see what we can

do."  (Resp't Ex. 16, p. 1354).

Petitioner maintains "because Special Agent Cook did not inform [Petitioner] of his rights

under *Miranda*, the interrogation via telephone is questionable and is subject to the same scrutiny

applied to the second interrogation" that occurred one day later at the Monroe County Sheriff's

Office.  (Pet'r Sept.30, 2009 Br., p. 102).  Respondent maintains that "this claim is unexhausted

as Petitioner did not raise this claim on direct appeal to the Georgia Supreme Court."  (Resp't Oct.

28, 2009 Br., p. 65).  In reply, Petitioner claims that he raised the issue in "Claim Seven in his

First Amended Petition for Habeas Corpus at the state level."  (Pet'r Jan. 19, 2010 Br., p. 46).

Petitioner does not maintain he raised the issue on direct appeal to the Georgia Supreme Court;[11]

nor does he maintain that he discussed (or even mentioned) the issue in any of his briefs presented

to the state habeas court.  He simply claims that he listed the issue in his first amended habeas

petition while his action was pending in the Butts County Superior Court.

---

[11]It appears that Petitioner did raise this issue pretrial and the court found the "statements were freely and voluntarily given." (Resp't Ex. 2, p. 245).  To properly exhaust this claim, Petitioner would have had to raise it on direct appeal to the Georgia Supreme Court.  Georgia law clearly requires that errors or deficiencies of the trial be objected to at trial **and** pursued on appeal.  ***See Black v. Hardin***, 255 Ga. 239 (1985).

Whether this listing, without more, actually exhausted the claim is certainly questionable, but neither party addresses this issue in their briefs.  "Exhaustion means more than notice.  In requiring exhaustion of a federal claim in state court, Congress surely meant that exhaustion be serious and meaningful." *Keene v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).  If unexhausted, the claim would be procedurally defaulted because Petitioner would be barred for raising it in the state courts at this time and he has not shown any exceptions to overcome the default.  O.C.G.A. § 9-14-51;  *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998); *Putman v. Turpin*, 53 F. Supp. 2d 1285, 1292 (M.D. Ga. 1999), *aff'd*, 268 F.3d 223 (11th Cir. 2001) (explaining that "when it is clear that the unexhausted claims would be barred in state court due to a state law procedural default, federal courts 'can . . . treat those claims now barred by state law as no basis for federal habeas relief'") (quoting *Snowden*, 135 F.2d at 735).

Even if Petitioner did adequately present this claim regarding the December 4, 2000 confession, and this court must, therefore, consider the merits of the claim, the claim still fails. Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), the prosecution may not use statements made during a "custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444. "[C]ustodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. The December 4 conversation took place over the telephone–Petitioner placed the call to his father and his father did not even know from where Petitioner was calling. (Resp't Ex. 16, p. 1351-54).  Petitioner has not cited, and the Court has not found, a case in which a telephone call, made by an individual who has not "been taken into custody or otherwise deprived of his freedom of action," was considered a "custodial interrogation." *Miranda*, 384 U.S. at 444.

Therefore, to the extent that Petitioner makes a separate and distinct Fifth Amendment claim regarding his December 4, 1996 statement, this claim fails.

### 2.  The December 5, 1996 meeting at the Monroe County Sheriff's Department

Petitioner claims that the December 5, 1996 "interview between John Cook and [Petitioner] was the 'functional equivalent' of a custodial interrogation" and that his statements should not have been admitted at trial.   (Pet'r Jan. 19, 2010 Br., p. 60).  Petitioner first raised this issue at trial.  Following a hearing, the trial court found that "the statements were freely and voluntarily given, and were more in the nature of a father-son exchange at a time when the defendant had expressed some desire to see his father about the events that had transpired." (Resp't Ex. 2, p. 246).  Moreover, the trial court also found that "[t]here was no trickery, deceit, promises, threats or extensive interrogation" and that John Cook did not interrogate his son at the request of the GBI, "the Sheriff's Department, or any law enforcement agency involved in the investigation."  (Resp't Ex. 2, p. 245).

Petitioner raised this Fifth Amendment claim on direct appeal to the Supreme Court of Georgia.  That court found the following facts regarding the December 5, 1996 statement:

> [B]efore Agent Upton read Cook his *Miranda* rights, Cook demanded his father and a lawyer; neither Agent Upton nor any other investigator in the case attempted to interrogate Cook after this invocation of his right to counsel; Agent Upton learned that John Cook was in Monroe County and that Cook had made an admission regarding the murders the night before; and Agent Upton told Sheriff Bittick that Cook had invoked his right to counsel and asked to see his father. The record does not show that Sheriff Bittick told John Cook his son wanted to speak with him, but Sheriff Bittick did contact the district attorney on December 5 regarding the procurement of a lawyer for Cook. Agent Upton transported Cook to Monroe County.
>
> After Cook arrived at the Monroe County sheriff's office, John Cook asked to speak with his son. John Cook testified that he "wanted to know what happened" and that, though it is difficult to separate out the law enforcement part

of his personality, he wanted to speak to his son mostly as a father ("I was still not thinking in my mind directly and openly that I was an agent with the FBI"). John Cook testified he was not intent on gathering evidence for the state; instead, he wanted "to try to persuade Andy to cooperate in hopes of getting a reduced sentence." However, John Cook also testified that he was not going to keep any incriminating evidence to himself, and that he had no doubt he would pass on additional information to the investigators. Neither Sheriff Bittick nor any other law enforcement agent asked him to speak with his son. Sheriff Bittick testified that John Cook was a personal friend he had known professionally for a number of years. He also testified that he sometimes permits parents to speak with their children in custody when he feels it is the right thing to do, and not for the purpose of gathering evidence.

Sheriff Bittick entered the office where Cook was being held and told Cook that "his Daddy wanted to talk to him." Cook said, "okay." John Cook and his son were left alone in an office; Cook was not handcuffed. Both men were crying and shaking; John Cook hugged his son. John Cook testified that it was not a normal interview but he asked specific questions about the murders and elicited specific answers from Cook. John Cook said this is typical of a conversation with his son, that Cook "does not volunteer anything. If you have a conversation with him you will do 90 percent of the talking." Cook, however, was not reluctant to talk. John Cook also told his son that "the best thing for us to do was cooperate and see if we couldn't get some kind of a plea bargain to a reduced sentence." Sheriff Bittick testified that, after the father-son conversation, John Cook sat in his office for several minutes, upset and crying. John Cook then spontaneously told Sheriff Bittick what his son had just told him regarding the murders. Sheriff Bittick did not ask any questions about the conversation.

***Cook v. State***, 270 Ga. 820, 824-25 (1999).

Contrary to Petitioner's assertions, these factual findings are not unreasonable and are supported by the record. Petitioner asserts the factual findings are incorrect and that his statements were coerced and involuntary because he "did not want to talk to his father." (Pet'r Sept. 30, 2009 Br., p. 104). The record, however, shows that Petitioner twice told Agent Upton that he wanted to speak with his father. Agent Upton testified that when he entered the Jones County Sheriff's Office to interview Petitioner, "the first words out of [Petitioner's] mouth [were], 'I want my father and a lawyer here'." (Resp't Ex. 8, p. 137). When Agent Upton later told Petitioner that he was unsuccessful in his attempts to contact John Cook, Petitioner again said that he wanted to speak with his father. (Resp't Ex. 8, p. 137). Additionally, after arrival at the

Monroe County Sheriff's Office, Sheriff Bittick told Petitioner that John Cook wanted to speak with him and Petitioner said, 'okay'." (Resp't Ex. 8, p. 130).

Petitioner also maintains that the court's finding that no law enforcement officer requested John Cook speak with his son was unreasonable.  However, the record is clear that Petitioner twice requested to see his father on December 5, 1996 and that John Cook requested to see his son.  It is undisputed that after Petitioner was located, arrested on unrelated charges, and taken into custody, no law enforcement officer asked John Cook to speak with his son.  Petitioner points to the December 4, 1996 call that Agent Upton made to John Cook in which he requested Mr. Cook's help in locating Petitioner.  (Resp't Ex. 16, p. 1349).  However, there is no indication that Agent Upton ever requested John Cook question petitioner regarding the murders, he merely asked John Cook if he could help him locate Petitioner.  Once Petitioner was actually located, no law enforcement official directed or requested Mr. Cook to speak to Petitioner.

Also, contrary to Petitioner's assertions, the record supports the finding that John Cook was not personally involved in the investigation of the Lake Juliette murders.[12]  In fact, he testified that he was familiar with the murders "[j]ust by what [he] read in the paper" and that he had "not personally worked on the case at all."  (Resp't Ex. 16, p. 1350).

After finding these facts, the Georgia Supreme Court then cited and applied *Miranda*, and its progeny.  The court explained as follows:

> The Fifth Amendment specifies that no person shall be compelled in a criminal case to be a witness against himself. In *Miranda*, the United States Supreme Court formulated procedural safeguards to ensure that the inherently compelling nature of an in-custody interrogation by the police will not undermine the suspect's will to resist and force him to speak "where he would not otherwise

---

[12]On appeal from the state habeas proceedings, the Georgia Supreme Court, when considering a related issue, determined that the FBI may have had jurisdiction to investigate the Lake Juliette murders, but again found that Mr. Cook had no actual investigative role in the case. *Cook*, 280 Ga. at 252.

do so freely." One of these safeguards is the rule that once an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. The Supreme Court has defined interrogation or its functional equivalent as express questioning by law enforcement officers or " 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" The Supreme Court has expressed particular concern about deceit or trickery during a police interrogation, such as using psychological ploys like a "reverse line-up," to subjugate the individual to the will of the examiner. However, the Supreme Court has made clear that "in deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." "Far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable."

*Cook*, 270 Ga. at 825-26 (citations omitted).

As the Georgia Supreme Court undoubtedly applied the law as determined by the United States Supreme Court (*Miranda* and *Edwards v. Arizona*, 451 U.S. 477 (1981)) to the facts of this case, the opinion is not "contrary to . . . clearly established Federal law." 28 U.S.C. § 2254 (d)(1); see also *Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004)(explaining that "[a] state court's decision that applies the law as determined by the Supreme Court to the facts is not 'contrary to' whether or not the federal courts would have reached a different result.").

The only other issue is whether the Georgia Supreme Court's decision "involved an unreasonable application of . . . clearly established Federal law." U.S.C. § 2254 (d)(1). We find that it did not. The Georgia Supreme Court explained that the "coercion proscribed by *Miranda* must be caused by the police." *Cook*, 270 Ga. at 826. Thereafter, the Court cited numerous cases in which various courts, including the United States Supreme Court in *Arizona v. Mauro*, 481 U.S. 520 (1980), have explained that "*Miranda* is not implicated when a suspect in custody is questioned or encouraged to confess by a father, mother, wife or girlfriend." *Cook*, 270 Ga. at

826. The Court acknowledged, however, that "[t]he difficulty in this case arises from the fact that John Cook was both an FBI agent and the suspect's father" and that such cases must be "resolved in a case-by-case basis, by viewing the totality of the circumstances, in order to determine if the law enforcement parent was acting as a parent or as an agent of the state when speaking with his or her arrested child." *Cook*, 270 Ga. at 826-27.

The Georgia Supreme Court analogized this case to that of *United States v. Gaddy*, 894 F.2d 1307 (11th Cir. 1990), in which the Eleventh Circuit found no *Miranda* violation when the suspect's aunt, who was a police officer, called the suspect in jail after he invoked his right to counsel and persuaded him to confess. *Cook*, 270 Ga. at 827. The Georgia Supreme Court cited the following factors considered by the Eleventh Circuit in making its decision:

> 1) [the suspect's aunt] was not part of the investigative team . . . ; 2) she was not directed by a superior to speak with [her nephew]; 3) she acted solely out of concern for his welfare; and 4) she was not acting in the normal course of her duties when she contacted him. She was a "worried aunt" who "communicated with [her nephew], not to assist the police department in solving a crime, but to protect her nephew."

*Cook*, 270 Ga. at 827 (citations omitted).

Correspondingly, the Georgia Supreme Court then found the following similar factors with regard to Petitioner's case:

> An analysis of Cook's case reveals the following: 1) John Cook was not part of the investigative team on the Lake Juliette murders . . . 2) Cook asked to see his father at the same time he requested an attorney; 3) John Cook was not directed by any law enforcement agent connected with Cook's case to speak to his son -- he made the request on his own initiative; 4) John Cook's motive in speaking with his son was to urge him to cooperate in the hope of getting a plea bargain; and 5) the interview involved hugging and crying by father and son which is not typical of a police interrogation. Under these circumstances, we conclude that the trial court did not err by finding that John Cook acted as a father and not as an agent of the state when he met with his son on December 5. Further, the meeting between John Cook and his son was devoid of any trickery, deceit, or other psychological ploy. Viewed from the defendant's perspective, "we doubt that [Cook], [after requesting to see his father and] told by officers his [father] will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way."

*Cook*, 270 Ga. at 827-28 (citations omitted).

The state court concluded that based on these facts, including the "lack of governmental coercion, [Petitioner's] December 5 statement to his father was voluntary under *Miranda* and *Edwards*. Cook, 270 Ga. at 828.   This Court is reminded that when attempting to determine if the state court's decision involved an unreasonable application of federal law, it need not decide if it "would have reached the same result as the state court if [it] had been deciding the issue in the fist instance." *Wright v. Sec'y for the Dep't of Corr*., 278 F.3d 1245, 1256 (11th Cir. 2002). Given the deference that this Court must give the state court decision, the Court cannot find that the Georgia Supreme Court's application of *Miranda* and its progeny was "objectively unreasonable." *Williams,* 529 U.S. at 409.  Therefore, the Court must deny relief on this claim.

## III.  CONCLUSION

Based on the above, the Court **DENIES** Petitioner's Petition for Writ of Habeas Corpus By a Person in State Custody.

**SO ORDERED**, this 18th day of March, 2010.


S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE


lnb